337 So.2d 269 (1976)
Monty M. GLORIOSO, Plaintiff-Appellee,
v.
Mrs. Georgie H. CHANDLER, Defendant-Appellant.
No. 12973.
Court of Appeal of Louisiana, Second Circuit.
August 31, 1976.
Rehearing Denied September 27, 1976.
*271 Mayer, Smith & Roberts by Alex F. Smith, Jr., Shreveport, for defendant-appellant.
Brocato & Mangham by C. P. Brocato, Shreveport, for plaintiff-appellee.
Before HALL, MARVIN and JONES, JJ.
En Banc. Rehearing Denied September 27, 1976.
MARVIN, Judge.
Glorioso and defendant, Mrs. Chandler, owned adjoining two-story brick buildings with a common or party wall between, which were constructed on Commerce Street in Shreveport more than 100 years ago.[1] Both buildings faced Red River, with Mrs. Chandler's building being the northernmost of the two, situated on the corner of Crockett and Commerce streets.
About November 1, 1971, the roof of Mrs. Chandler's building collapsed, allegedly causing damage to the party wall between the buildings. A short time later a demolition company hired by Mrs. Chandler sought a permit from the City Building Inspector to demolish the Chandler building. After an examination, the Building Inspector condemned both buildings and sent to Glorioso an order, which after a delay was granted, required demolition to commence on January 2, 1972. The buildings were demolished shortly thereafter.
On February 21, 1972, Glorioso brought suit and was awarded damages after trial in 1975. Mrs. Chandler appeals. We affirm.
Mrs. Chandler's building had not been occupied for about seven years. In 1964, Mrs. Chandler unsuccessfully sought the cooperation of the City Building Inspector to have both buildings condemned and ordered demolished. Glorioso's building had been used for many years by a tenant engaged in the business of trading in pecans and tanning cowhides. About nine months before Mrs. Chandler's roof collapsed, Glorioso reroofed his building.
When Mrs. Chandler's roof collapsed on the second floor of her building, the party wall was subjected to additional horizontal stress and a quantity of brick was punched out or knocked out of the wall by the roof structure, causing a hole or gap in the top of the wall approximately 5 × 12 feet. The failure of the wall caused the roof structure of Glorioso's building to twist and pull away from the remaining part of the wall, but did not cause Glorioso's roof to collapse. An estimate by a builder and roofer to repair this specific damage included 20,000 brick, 2 × 12 and 4 × 4 beams and other material, which with labor and other costs totaled $9,984.
Glorioso did not make these repairs because the City made other requirements which would have greatly increased, to what was described as "prohibitive," the cost of complying with building codes.
*272 Mrs. Chandler contended below that the ruin of both buildings was caused by their ancient and dilapidated condition arising from the ravages of time, and not by any neglect on her part. Alternatively, Mrs. Chandler contended below (1) contributory negligence (neglect) by Glorioso; and (2) that Glorioso's knowledge of the condition of both buildings and his failure to remedy the condition or to protect against damage served as a bar to any recovery.
The trial court found the collapse of Mrs. Chandler's roof caused damage to the party wall and precipitated the condemnation and eventual demolishment of both buildings. Experts below gave conflicting opinion testimony as to causation, but the evidence taken as a whole leads us to conclude the trial court was correct in its findings in this respect.
Mrs. Chandler's counsel, in deference to the discretion afforded trial courts in factual determinations does not argue the factual issue here. Instead, the appellate issues are framed by her counsel in these terms:
(1) Where a party wall is damaged by the fault or neglect of one co-owner and repairs are not made because the adjoining buildings are condemned by municipal authority and demolished, is the other co-owner entitled to recover damages from the neglectful co-owner?
(2) If damages are allowed the innocent co-owner, is recovery allowed for 100 percent of the party wall damage or only 50 percent?
(3) Is the innocent co-owner barred from recovery if he fails to exercise the privilege granted him under LSA-C.C. Art. 671 to make "necessary works" to prevent damage threatened to his building by the ruin or fall of the adjoining building, as in the case of Factors and Traders Insurance Company, et al. v. Werlein, 42 La.Ann. 1046, 8 So. 435 (La.1890)?
Civil Code Articles 670 and 2322 set forth the obligations of property owners to neighbors:
C.C. Art. 670 provides:
"Every one is bound to keep his buildings in repair, so that neither their fall, nor that of any part of the materials composing them, may injure the neighbors or passengers, under penalty of all losses and damages, which may result from the neglect of the owner in that respect."
C.C. Art. 2322 provides:
"The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."
These two articles have been generally construed together to impose strict liability or liability without fault on property owners whose buildings fall to ruin and cause damage to other persons or property. See McConnell v. Lemley, 48 La.Ann. 1433, 20 So. 887 (1896) and Green v. Southern Furniture Company, 94 So.2d 508 (La.App., 1st Cir. 1957). The word "ruin" is construed as the collapsing, giving away or falling of a substantial component of the building. See Davis v. Royal-Globe Insurance Companies, 257 La. 523, 242 So.2d 839 (1970).
Civil Code Article 670 is in the section of the Code relating to servitudes. Civil Code Article 2322 is in the section of the Code relating to offenses and quasi-offenses. Each section imposes a similar legal obligation on the property owner to respond in damages for harm caused by "things" for which the owner is responsible.
"Under Louisiana law, founded on Articles 670 and 2322, the owner of a building is liable to a neighbor or passer-by injured through the fall of his building due either to a vice in its original construction or to his neglect to repair it. His fault is founded upon the breach of his obligation to maintain or repair his building so as to avoid creation of risk of undue injury to others.
"Neither ignorance of the condition of the building, nor circumstances that the defect could not easily be detected, absolve the owner from his liability for damages so caused . . ." Loescher v. Parr, 324 So.2d 441, 444 (La.1975).

*273 "Articles 2315 through 2324 of the Louisiana Civil Code comprise the code's entire chapter of legal principle regulating offenses and quasi-offenses.
"The underlying principle is provided by Article 2315: `Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. * * *' The remaining articles constitute amplifications as to what constitutes `fault' and under what circumstances a defendant may be held liable for his act or that of a person or thing for which he is responsible.
"Article 2316 provides for delictual (tort) responsibility for negligent acts or omissions: `Every person is responsible for the damage he occasions not merely by his act, but his negligence, his imprudence, or his want of skill.' However, negligence is not necessarily a basis for the obligation to respond in damages for harm caused by persons or things for which we are responsible as provided by the subsequent Articles 2317 through 2322." Loescher v. Parr, 324 So.2d 441, 445 (La.1975) (Emphasis supplied).
In Loescher, supra, it was noted that the owner of a defective thing which injured another could avoid the strict liability where it is shown that the injury was caused (1) by the fault of some third person (2) by the fault of the person injured, or (3) by an irresistible cause or force not usually foreseeable.
". . . He is absolved from such liability only if the thing owned by him falls, not because of its defect, but rather because of the fault of some third person or of the person injured thereby, or because the fault is caused by an irresistible cause or force not usually foreseeable, Article 3556(14), (15) (usually, an act occasioned exclusively by violence of nature without the interference of or contribution by any human agency)." 324 So.2d 445.
As we appreciate the circumstances in Factors and Traders Insurance Co. et al. v. Werlein, cited supra, on which Mrs. Chandler relies, it was such an irresistible force [". . . an act occasioned exclusively by violence of nature without the interference of or contribution by any human agency] that caused most of the damage for which recovery was denied. There, the old National Theater at Baronne and Perdido in New Orleans burned shortly before midnight on July 1, 1887. The rear wall of the ruin remained standing some 90 feet in elevation. The lower 45 feet of the wall was a common or party wall between a building to the rear of the old theater belonging to Czarnowski (Factors and Traders insured). When the theater burned, the crest or gable of its rear wall fell on Czarnowski's building causing about $900 damage to the Czarnowski building.
Czarnowski called upon his insurance company to pay the loss under its policy. Czarnowski was aware of the threatening and dangerous condition of the high wall. He suggested the insurance company take steps to avoid further damage or if the insurance company considered it his risk, that he would take steps to brace the wall to prevent further injury. The insurer declined to do anything at that point and suggested to Czarnowski that he obtain the theater owner's (Werlein's) consent to brace the wall. Czarnowski asked the insurer to pay $50 on a $100 estimated cost of bracing the wall. The insurer declined.
On the second day after the fire, Werlein began negotiating with demolition companies to tear down the wall. Eventually, on July 6, 1887, a contractor was obtained for this purpose, to commence demolition the next morning (July 7). The contractor sought Czarnowski's consent to enter his building to prepare for the razing of the theater wall. Czarnowski referred the contractor to his insurance company who had agreed that day with another contractor to repair the damage to the Czarnowski building. The demolition contractor obtained the consent of the repair contractor to enter the Czarnowski building and immediately commenced work. Within a matter of hours, a wind storm of "moderate velocity" blew the wall down, causing an additional $3,300 damage to the Czarnowski building.
*274 Czarnowski sued his insurance company for the entire damage. The insurer compromised and settled with Czarnowski for some $4,400, with $3,300 being attributed to the July 7, 1887, wind-storm damage. The insurer was assigned Czarnowski's claims against Werlein and brought suit against Werlein for its loss, alleging Werlein was liable on the theory of quasi-offense. The Supreme Court then reasoned in this fashion:
"But there are other principles to be taken into consideration in determining an owner's liability; for the Code provides that `the damage caused is not always estimated at the exact value of the thing destroyed or injured. It may be reduced according to circumstances, if the owner of the thing has exposed it imprudently.' (Our italics.) Rev.Civil Code, art. 2323. Hence we must consider whether, under the circumstances detailed in this case, Werlein is responsible to Czarnowski for the damage he sustained by the demolition of his building, through the neglect of the former to strengthen and repair the toppling and dangerous walls of his own; and, while thus considering, we must determine whether Czarnowski imprudently exposed his building to the danger; and we must further determine, if it was so exposed, whether the damage actually sustained must, on that account, be reduced or altogether disallowed. This directs our attention to another precept of the Code which is applicable. It is as follows, viz.: `Every one is bound to keep his buildings in repair, so that neither their fall, nor any part of the material composing them, may injure the neighbors or passengers, under the penalty of all losses and damages which may result from the neglect of the owner in that respect.' Rev.Civil Code, art. 670. `When a building threatens ruin, the neighbor has a right of action against the owner to compel him to cause such a building to be demolished or propped up. In the mean time, if there be danger of any damage by its fall, he may be authorized to make the necessary works, for which he shall be reimbursed, after the danger shall be ascertained by experts.' (Our italics.) Rev.Civil Code, art. 671. In view of these requirements of law and being aware of the dangerous condition of the walls of the burnt building, Czarnowski had a right of action against Werlein to compel him to prop it so as to prevent it from falling; and, in the mean time, he might have been authorized to take the necessary means of protecting his own property. This he wholly failed to do, and for that reason was plainly guilty of neglect . . ." 8 So. 437.
In denying recovery to Czarnowski's insurer, the court concluded:
". . . In this case the fault of Werlein and Czarnowski was mutual, and the negligence of each was a proximate cause of the injury. We are satisfied that the plaintiffs are not entitled to recovery." 8 So. 438.
In the instant case, Glorioso's roofer, when he reroofed Glorioso's building in February, 1971, told Glorioso about the "sagging" roof of Mrs. Chandler's building. Glorioso thereafter attempted to contact other persons named Chandler whom he believed were members of the family which owned the building. He was unsuccessful in these attempts and after several weeks ceased his efforts. Mrs. Chandler relies on these admissions by Glorioso and contends that Glorioso is barred from recovery here by the holding in Factors and Traders Insurance Company, supra, and particularly C.C. Art. 671, quoted therein.
In Factors and Traders, supra, Czarnowski was held to have been at fault (the second avoidance of liability under Loescher, discussed supra) because the danger was imminent and he did not employ "reasonable exertion to lessen the danger . . ." We also believe that another factor, although not expressed, which influenced the court in Factors and Traders in reaching the result, was that the wind storm blew the high wall onto Czarnowski's building (the third avoidance of liability under Loescher, supra).
*275 In our opinion, C.C. Art. 671 merely places the defective building into the category of the servient estate of a servitude, obligated to the neighboring dominant estate. See Title IV, Book II, La.C.C. Arts. 646 et seq. The defective building owner who fails in his obligation to keep his building in repair (Art. 670), then becomes obligated to "permit" (Art. 655) the neighbor who is threatened with danger from the defective building to make the necessary "works" ("proppings" is the correct translation) under Art. 671. Insofar as propping is concerned, the codal scheme is permissive as to the servient (defective) building as well as to the dominant (neighboring) building.
". . . the neighbor has a right of action against the owner to compel him to cause such a building to be demolished or propped up. In the meantime, if there be danger . . . [the neighbor] may be authorized to make the necessary [proppings] . . ." C.C. Art. 671.
Under the authority of Loescher and the obvious design of the Civil Code, we do not interpret Art. 671, as Mrs. Chandler contends we should, to mean that the neighbor threatened with danger, in all cases must take steps to protect himself (as a requirement of law, to use language from the Factors and Traders case) or otherwise be barred from recovery. Where the danger is imminent and the "propping" may be done with little or no expense (as in the Factors and Traders case, it may be that contributory neglect (negligence) of the neighbor may bar his recovery or mitigate damages (C.C. Art. 2323), but it is not as a matter of law, the neighbor's mere failure to exercise a permissive right which will bar his recovery under C.C. Art. 671, in all cases.
The owner of a building is liable to a neighbor injured by the fall of the building caused by the owner's neglect to repair the building. The neighbor's damage may be mitigated in part, or in whole, when the fall of the defective building is imminent to a reasonable mind and there are reasonable and relatively inexpensive means by which the neighbor might, with some reasonable anticipation of certainty, undertake to avoid the damage, but fails or neglects to do so.
Here, Mrs. Chandler's roof remained in a sagging condition at least ten months before it collapsed. How long it was sagging before it was noticed is not shown. The entire roof structure of Mrs. Chandler's building had rotted to such an extent that more than a simple propping would have been necessary to prevent its ultimate collapse. We deduce that this, however, could have been determined only from an inspection made within the building and not from the outside of the building. Its collapse was not imminent and the cost of avoiding the collapse was not relatively inconsequential. We do not find that Glorioso imprudently exposed his building so as to mitigate damages or that Glorioso can be held to have been contributorily negligent so as to bar recovery under the circumstances presented. We believe the codal authorities and the principles set forth in Loescher, supra, control and that Factors and Traders is factually inapposite.

QUANTUM
The lower court awarded $12,500 in damages to Glorioso. Glorioso had reroofed his building at a cost of $2,430 about nine months before the roof of Mrs. Chandler's building collapsed. There were several vats constructed in the lower floor of Glorioso's building which were particularly suited to the use of Glorioso's tenant who treated cowhides. The tenant had been in the building for more than ten years and regularly paid $235 gross monthly rental to Glorioso. Once the demolition commenced and Mrs. Chandler's building was razed, the exterior walls of the Glorioso building remained standing without extraneous support, interiorly or exteriorly, before they were knocked down. We infer that Glorioso's building was in a relatively sound structural condition, considering its age and type of structure. Glorioso paid $2,500 to have his building demolished, with the salvaged *276 materials going to the demolition company. We conclude that Glorioso sustained pecuniary loss (his net rentals for an undetermined time) and expense (the cost of demolition under the city condemnation order).
In this case, we are not determining the cost of repairing or restoring the party wall. The party wall was not repaired. Under these circumstances, C.C. Arts. 678, 679, and other articles of the Civil Code pertaining to walls in common, have no application and we need not determine as to what extent if any, one common owner may be required to contribute to expense of repairing a common wall.
The assessment of damage in cases of injury to property is not susceptible to yardstick measurement in every case. In East v. Pan American Petroleum Corp., 168 So.2d 426, 430 (La.App., 3rd Cir. 1964) it was appropriately observed:
"`One whose real property is injured by another's wrongful and negligent act is entitled to such damages as will compensate him for the injury or loss sustained. No hard and fast rule can be laid down, however, for the measurement of those damages; whatever rule is best suited to determine the amount of the loss in the particular case should be adopted.'
"Also, in the assessment of damages in cases involving offenses and quasi offenses much discretion must be left to the trial judge or jury." 168 So.2d 430. (Citations omitted).
Three approaches have been mentioned in some cases: (1) the cost of restoration (2) the cost of replacement and (3) the difference in value of the thing before and after the damage. See Granger v. Bouillion, 220 So.2d 764, 766 (La.App., 1st Cir. 1969), where a camp house was damaged but was not repaired or replaced in same manner as it was originally constructed. The third approach (difference in value) was the approach used there.
In fixing the award below, the trial court commented:
". . . [I]n view of the fact that the building was rented . . . and in view of the age and general condition of the building and that the roof had been repaired . . ., we think a fair award to [Glorioso would] be $12,500.00."
The trial court noted that the estimate of repairing Glorioso's building, excluding the requirements of the City Building Code, was $9,984. These repairs were not undertaken because of the additional building code requirements.
The trial court also noted the cost of demolishing the building of $2,500 in the written reasons for judgment below. The trial court considered Glorioso's pecuniary loss; the fact that the building was utilized and was in a fair state of repair [or inferentially, that it had some value] before Mrs. Chandler's roof collapsed, as compared to the situation afterward. We do not find any abuse of discretion in the manner of assessment or the amount of damages by the trial court.
At appellant's cost, judgment is
AFFIRMED.
NOTES
[1] The buildings are shown in an 1873 photograph made by the U.S. Army Corps of Engineers. One witness was of the opinion the buildings were constructed by 1867.